## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| **CITY OF CARTHAGE, MISSOURI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19-05001-CV-SW-WBG** |
| | ) | |
| **UNION PACIFIC RAILROAD** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Pending are Defendant's Motion to Exclude Certain Testimony (Doc. 79), Defendant's Motion for Summary Judgment (Doc. 86), Plaintiff's Motion for Partial Summary Judgment (Doc. 88), Plaintiff's Motion for Leave to File Notice of Supplemental Authorities (Doc. 111), and Plaintiff's Notice of Withdrawal and Substituted Motion for Leave to File Notice of Supplemental Authorities (Doc. 112). As set forth in this Order, Defendant's Motion to Exclude is **DENIED AS MOOT**, Defendant's Motion for Summary Judgment is **DENIED IN PART AND GRANTED IN PART**, Plaintiff's Motion for Partial Summary Judgment is **DENIED**, Plaintiff's Motion for Leave to File First Notice of Supplemental Authorities is **STRICKEN**, and Plaintiff's Substituted Motion for Leave to File First Notice of Supplemental Authorities is **DENIED**.

## I.    BACKGROUND[1]

This matter arises from a dispute about who is responsible for repairing or replacing certain bridges in the City of Carthage ("the City"). The City contends Union Pacific Railroad Company

---

[1] Unless otherwise noted, the facts in the background section are uncontroverted or were not properly controverted by the non-moving party. *See* Fed. R. Civ. P. 56(c) (setting forth how a party demonstrates a fact is genuinely disputed). Additionally, throughout this Order, the Court cites the pagination automatically applied to filings on CM/ECF. As such, the automatically generated pagination may be different from the page numbers utilized by the filing parties.

("UPRC") is obligated under the City's ordinances to keep in repair and maintain in good condition the bridges on High, Oak, Walnut, and Sycamore Streets.[2] Doc. 32 at 3-11; *see also* Docs. 89, 103. UPRC argues, among other things, the City's ordinances do not create a contractual duty. *See* Docs. 86-87, 102.

## A.      The City's Amended Charter and Relevant Ordinances

The City amended its initial charter in February 1875. Doc. 89 at 6; Doc. 102 at 5. Pursuant thereto, "all ordinances passed by [the City's] council shall be signed by the mayor and countersigned by the clerk and published for the information of the inhabitants of said city, in such manner as the council may direct by ordinance, and from time to time, distribute in such manner as the council may prescribe." Doc. 89 at 6; Doc. 89-1 at 2, 10; Doc. 102 at 5.[3] The City Council was granted authority to, *inter alia*, "pass all ordinances which may become necessary to carry any provisions of this charter into effect, and also to enforce the observance thereof." Doc. 89 at 6; Doc. 89-1, at 2, 16, 21; Doc. 102 at 5.

The amended charter also includes provisions setting forth the City Council's power to, among other things, "open, alter, widen, abolish, extend, establish, grade, pave or otherwise improve and keep in repair all roads, streets and bridges within the city limits"; "establish and keep in repair good and safe bridges"; "direct and control the laying and construction of railroad tracks,

---

[2] The City also alleges several at-grade crossings need repair or replacement. Doc. 32 at 7-8. However, the parties agree the at-grade crossings identified in the Second Amended Complaint have been repaired. Doc. 86 at 13-14, 89; Doc. 103 at 10. While the City claims the at-grade crossing at Zapetal Way is "still in need of repair," that crossing was not included in the Second Amended Complaint. Doc. 32 at 7-8; Doc. 103 at 10. Accordingly, only the bridges on High, Oak, Walnut, and Sycamore Streets remain at issue. Doc. 86 at 13-14, 89; Doc. 103 at 10.

[3] While the City Clerk's declaration is cited in section I(A), the Court solely relies on the City Clerk's declaration for assistance in reading the handwritten ordinances and her representation that true and accurate copies of the ordinances were provided with her declaration. *See* Doc. 89-1 at 2-4. UPRC does not dispute the language in the ordinances or the City Clerk's recitation of same, nor does it dispute that true and accurate copies of the ordinances accompanied the City Clerk's declaration. UPRC, however, objects to the City Clerk testifying to the legal effect of the ordinances. Doc. 101 at 1-2. As discussed *infra*, section III(C)(1), the Court does not consider the City Clerk's testimony as to the legal effect of the language in the ordinances.

bridges, turnouts and switches in the streets and alleys"; "require that railroad tracks and bridges, turnouts and switches shall be so constructed and laid as not to interfere with ordinary travel, and the use of the streets and alleys"; "require the railroad companies to keep in repair the streets and alleys through which their tracks may run"; and "construct and keep in repair suitable crossings at the intersection of said tracks with the street and alleys." Doc. 89-1 at 18-19.[4]

       **(1)**       **Ordinance No. 72**

On February 14, 1881, the City enacted Ordinance No. 72.  Doc. 87 at 11; Doc. 89 at 6-7; Doc. 89-1 at 2-3, 28-32; Doc. 102 at 5.  This ordinance grants the Missouri Pacific Railway Company ("MPRC"), which is UPRC's predecessor, "the right of way for a rail road [sic] track, turnouts, switches, side tracks and telegraph lines, through Parsons Street and across all the Streets and Alleys intersecting the line of said railroad in the City of Carthage." Doc. 89-1 at 28.  Per the ordinance, MPRC is granted the right of way to do the following:

> [C]onstruct, build, maintain, use and operate a railroad . . . along and through Parsons Street from Limestone Street on the north to Cedar Street on the south . . . and to construct, build, maintain and use all necessary and convenient side tracks, turnouts, and switches in and on the east side of the main tract on Parsons Street between Limestone and Oak Streets . . . and to build, construct, maintain, and operate the said railroad . . . over and across . . . High, Limestone, Eldorado, West Vine, Mound, Central Avenue, Olive, Oak, Walnut, Sycamore, Chestnut, Poplar and Cedar Streets and all the alleys . . . between any two said Streets . . . . The said Railway Company shall construct and keep in repair suitable crossings on the Streets of each end of its side tracks and a crossing on Central Avenue and also suitable crossings at the intersection of the main track with the other Streets . . . and keep all such crossings and approaches in good condition for the safe and convenient passage of animals, teams and persons.

*Id*. at 2-3, 28-32.  The Mayor and City Clerk signed the ordinance, and on February 15, 1881, the City Clerk certified the ordinance was published in the *Carthage Daily Banner*.  *Id*. at 33-34.

---

[4] UPRC asserts the amended charter did not grant the City "authority to legislate construction or maintenance of railroad facilities." Doc. 102 at 5.  However, as set forth above, the amended charter granted the City Council authority to "direct and control the laying and construction of railroad tracks [and] bridges" and "require the railroad companies to keep in repair the streets and alleys through which their tracks may run." Doc. 89-1 at 19.

### (2) Ordinance No. 75

Also on February 14, 1881, the City enacted Ordinance No. 75, which grants the "right of way" to MPRC to construct a railroad "connected therewith, in, along, and through Parsons Street" by August 1, 1881. Doc. 87 at 12; Doc. 89-1 at 3, 36-40; Doc. 103 at 12. The ordinance also requires MPRC to "construct and keep in repair suitable crossings on the Streets of each end of its side tracks and a crossing on Central Avenue and also suitable crossings at the intersection of the main track with the other Streets" and "keep all such crossings and approaches in good condition for the safe and convenient passage of animals, teams and persons." Doc. 89-1 at 39. The Mayor and City Clerk signed the ordinance, and it was published on February 15, 1881. *Id*. at 40.

### (3) Ordinance No. 79

On March 18, 1881, the City enacted Ordinance No. 79, which grants MPRC "the right to build a fence on each side of the cut through Parsons Street, from Olive Street . . . to Cedar Street . . . , and across all of the Streets and Alleys between said Olive and Cedar Streets . . . ." Doc. 89-1 at 3, 42-44. Pursuant to the ordinance, "good crossings shall be made and kept open at all times while said cut is being made, by said Railway Company, at Olive & Cedar Streets," and "the bridge, and necessary grade of the street to approach the same, on Walnut Street, shall be made and put in a good and safe condition for travel." *Id*. at 43. The ordinance was signed by the Mayor and City Clerk, but there is no indication the ordinance was published. *See id*. at 44.

### (4) Ordinance No. 105

On November 28, 1881, Ordinance No. 105 was enacted by the City. Doc. 87 at 12; Doc. 89-1 at 4, 46-49; Doc. 103 at 13. According to the ordinance, its purpose is "to compel Railway Companies to Construct Crossings at the intersections of their tracks with the [City's] streets, alleys, and avenues." Doc. 89-1 at 4, 46. The ordinance sets forth the following:

> If any Railroad Company, owning or operating any Railroad line in the City . . . Shall fail, neglect or refuse to construct and keep in repair, suitable, safe, and convenient crossings, Bridges or tunnels at the intersection or point of Crossing of each and every street and alley, crossed by any track or switch of such Railroad . . . within ten (10) days after having been notified in writing . . . to construct or repair such bridge, tunnel or crossing . . . , such Railroad Company shall be deemed guilty of a Misdemeanor, and shall be punished . . . by a fine . . . .

Doc. 89-1 at 4, 46-48. Ordinance No. 105 is signed by the Mayor and City Clerk; however, there is no indication it was published. *See id.* at 49.

### (5)    Ordinance No. 67

On June 23, 1884, the City enacted Ordinance No. 67. Doc. 87 at 11; Doc. 89-1 at 4, 51-59; Doc. 103 at 11-12. The ordinance requires all railroad companies owning or operating railroads through the City to "construct[,] maintain and keep in repair, suitable, safe and convenient crossings at the intersections of all streets and alleys crossing their rail road [sic] track." Doc. 89-1 at 51. Pursuant to the ordinance, "crossings shall be constructed the whole width of the street or alley and of the kind and description . . . ordered by the Council." *Id.* at 53. "When any crossing . . . shall be ordered by the Council to be constructed or repaired by any railroad company, the City Clerk shall immediately notify the Railroad Company setting out in full in the notice a copy of the order . . . ." *Id.* at 54. If, after being notified, a railroad company fails to construct or repair the crossing, the City may recover its costs for constructing or repairing the crossing. *Id.* The ordinance was signed by the Mayor and City Clerk and was published on June 27, 1884. *Id.* at 57-59.[5]

---

[5] The parties' briefs also discuss Ordinances 83 and 145. *See, e.g.*, Doc. 87 at 12; Doc. 103 at 12-13. Ordinance No. 83 grants MPRC "or its successors and assigns the right of way for a railroad track" across McGregor Street, and Ordinance No. 145 grants MPRC "or its successors or assigns the right of way for a railroad track over and along Parsons Street." Docs. 103-6, 103-7. The parties agree neither ordinance refers to the bridges at issue. Doc. 86 at 138-41; Doc. 87 at 12; Doc. 103 at 12-13. Further, the City does not rely on either ordinance to support its summary judgment motion. *See* Doc. 89. Thus, the Court does not address these ordinances at length.

5

**B.      City's Municipal Code**

On September 13, 1988, the City adopted a municipal code.  Doc. 87 at 11; Doc. 103 at 11.

According to the municipal code's preface, "This Code constitutes a complete recodification of

the ordinances of the City of Carthage of a general and permanent nature."  Carthage, Mo., Mun.

Code Preface (2011), https://library.municode.com/mo/carthage/codes/code_of_ordinances/168

920?nodeId=COCA.[6]  Pursuant to the ordinance adopting the municipal code, "All ordinances of

a general and permanent nature enacted on or before April 12, 1988 and not included in the Code

or recognized and continued in force by reference therein are hereby repealed."  Carthage, Mo.,

Mun. Code Adopting Ordinance, sec. II (2011), https://library.municode.com/mo/carthage/codes

/code_of_ordinances/168920?nodeId=COCA; Doc. 87 at 11; Doc. 103 at 11.  As discussed later

in this Order, the parties dispute whether the City's municipal code repealed Ordinances 72, 75,

79, 105, and 67.  *See infra*, section III(C)(1).

**C.      MPRC's Lease Agreement and UPRC's Acquisition of MPRC**

In 1992, MPRC executed a lease agreement with the Missouri & Northern Arkansas

Railroad ("MNAR").  Doc. 89 at 11; Doc. 89-3; Doc. 102 at 6.  Therein, MPRC, which represented

it has full authority to enter into the agreement, leased "certain lines of railroad" in and around the

City including the "right-of-way, tracks, rails, . . . crossings, bridges, . . . and any and all

improvements or fixtures affixed to the right-of-way."  Doc. 89 at 11; Doc. 89-3 at 5, 22, 52-57;

Doc. 102 at 6.  In return, MNAR agreed to maintain "grade crossings, . . . bridges, . . . and other

structures" and give "high priority" to "all grade crossings."  Doc. 89-3 at 18.

---

[6] The Court is unable to view the municipal code as adopted in 1988.  The City Clerk indicates the "existing Charter"
is attached to her declaration as Exhibit F; however, Exhibit F is Ordinance No. 67.  *See* Doc. 89-1 at 5, 50-59.  While
UPRC cites an online source for the municipal code, the source does not provide any version of the municipal code
predating 2011.  Doc. 87 at 11.  Nevertheless, the parties agree on the content of the relevant portions of the municipal
code and use language identical to the 2011 version.  *See* Doc. 87 at 11; Doc. 103 at 11.  Therefore, the Court relies
on the parties' representations of the language in the 1988 municipal code.

In 1997, UPRC acquired MPRC and its holdings, and since that time, UPRC has owned MPRC. Doc. 89 at 11; Doc. 102 at 6. In 2009 and 2012, the lease agreement between MPRC and MNAR was amended by and between UPRC and MNAR. Doc. 89-3 at 67-73.

**D.      Bridges at Issue**

The Oak, Walnut, Sycamore, and High Street bridges ("the bridges") are vehicular and pedestrian bridges that pass over railroad tracks. Doc. 86 at 11, 90; Doc. 103-2 at 10. According to reports from the Missouri Department of Transportation ("MoDOT"), the Oak, Walnut, and Sycamore Street bridges were built in 1920, and the High Street bridge was built in 1930. Doc. 86 at 61; Doc. 89-4 at 17, 22, 27, 32. The City avers MPRC (UPRC's predecessor) constructed the bridges. Doc. 89 at 10; Doc. 89-2 at 3. In support, it cites (1) Zebadiah Carney's declaration, and (2) "historical evidence." Doc. 89 at 10; Doc. 89-2; Doc. 103 at 9-10; Doc. 103-1.

Carney, the City's Director of Public Works, represents his declaration is based on personal knowledge. Doc. 89-2 at 2. But he fails to provide any basis as to why he has personal knowledge about who constructed the bridges in 1920 and 1930. *See id.* If a declaration is used in support of or in opposition to summary judgment, the declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Even if Carney's declaration satisfied the Rule 56 requirements, the Court cannot consider Carney's statements that MPRC constructed the bridges because those portions contradict his prior deposition testimony. That is, Carney testified he had no evidence as to who built the bridges. Doc. 86 at 11-12. This Court cannot consider portions of a declaration that contradict the declarant's prior deposition testimony. *See Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498 (8th

Cir. 2008). For these reasons, the Court cannot consider Carney's declaration that MPRC constructed the bridges.

The "historical evidence," upon which the City relies for its assertion that MPRC built the bridges, is a portion of the *Mornin' Mail*, which appears to have been published by Heritage Publishing on October 19, 2011. Doc. 103 at 9-10; Doc. 103-1. The *Mornin' Mail* reported, "Missouri Pacific [R]ailway" built the Sycamore Street Bridge. *Id.* This document is inadmissible hearsay, which the Court cannot consider when deciding summary judgment. Fed. R. Civ. P. 56(c)(1)-(2); *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014) (stating "newspaper articles are 'rank hearsay' that do not fit a hearsay exception.").[7]

It is uncontroverted that, since 2002, MoDOT informed the City of problems with the bridges. *See*, *e.g.*, Doc. 86 at 28-33, 57-60, 121-22, 159-75, 215-38; Doc. 87 at 9-10; Doc. 103 at 10-11. The Court will not discuss every MoDOT report in the record but will address a few reports. In 2003, MoDOT inspected the Oak and High Street bridges and rated their structures a "2," which is defined as "basically intolerable" and "requiring high priority for replacement." Doc. 32-1 at 8, 25; Doc. 86 at 29-31, 59-60, 143-44, 147-48, 152; Doc. 89 at 13; Doc. 89-2 at 3; Doc. 89-4 at 17, 32. As a result, weight restrictions were placed on those bridges. Doc. 89-2 at 3; Doc. 89-4 at 17, 22, 32. In 2005, MoDOT, upon inspection of the Walnut Street bridge, found the "deck geometry" was basically intolerable. Doc. 32-1 at 12; Doc. 86 at 121-22. Also in 2005, MoDOT reduced the allowed speed on the Sycamore Street bridge "due to vertical alignment." Doc. 31-1 at 23. In 2010 and 2012, MoDOT rendered "critical inspection" reports on the Sycamore and Walnut bridges, and consequently, those bridges were closed. Doc. 32-1 at 12-13, 19-22; Doc. 86 at 14, 35-38, 69, 184-98, 200-14, 218; Doc. 89 at 13; Doc. 89-4 at 22; Doc. 102 at 60.

---

[7] Even if the Court were to consider the *Mornin' Mail*, it does not establish who built the other three bridges.

## E. Communications and Meeting in 2011

As far back as 2011, the City had conversations with UPRC and MNAR about repairing the bridges. Doc. 86 at 109. It is undisputed that individuals from the City, UPRC, and MNAR met in 2011. Doc. 86 at 39, 244-45; Doc. 87 at 11; Doc. 103 at 11; Doc. 103-2 at 24. The meeting's purpose was to "discuss a more strategic plan on addressing the condition of bridges that span the Railroad's right of way through the City . . . instead of on a bridge by bridge basis." Doc. 86 at 244. Pursuant to the meeting notes, UPRC claimed it did not own the bridges. *Id*. at 245. The notes also indicate a City employee recalled receiving "a letter from the Railroad . . . indicating that the Railroad owned the bridges," but the letter was not located. *Id*.

## F. Communications in 2013

On February 15, 2013, the City's Mayor sent a letter to UPRC demanding UPRC address the bridges' conditions. Doc. 86 at 71-73, 91-92, 124-25, 240; Doc. 87 at 9-10; Doc. 89-6 at 3; Doc. 103 at 11. On February 20, 2013, UPRC's Manager of Special Projects Industry and Public, Mike Benjamin, responded: "It is my understanding that if the agreements indicate that the Railroad is responsible for maintenance, it will be . . . completed by the MNARR." Doc. 89-6 at 2-3. Soon thereafter, UPRC's Manager Real Estate – Contracts, Paul Farrell, sent an email stating, "No agreement. Railroad occupies City property by Ordinance. Maintenance is the responsibility of the Railroad which is most likely the MNAR." *Id*. at 2; Doc. 89 at 13; Doc. 102 at 8.[8] On June

---

[8] UPRC argues Farrell's email is inadmissible because (1) it constitutes hearsay and cannot be construed as an admission by a party opponent, (2) he lacked personal knowledge when making the statements, (3) he could not provide a legal opinion, and (4) he was not qualified to provide the opinions he did. Doc. 101 at 5-6. UPRC provides a declaration from Farrell wherein he stated he was not an attorney, he never purported to give legal advice, he was not qualified to provide an opinion on whether an ordinance created a legal obligation, and he did not have authority to make policy or decisions for UPRC. *Id*. at 27-29. Nevertheless, in reaching its decisions on the pending motions, the Court does not rely on Farrell's email, and thus, UPRC's arguments regarding the admissibility of the email are moot. The email is referenced to provide context for the City's June 3, 2013 communication.

3, 2013, the City's Mayor sent UPRC copies of Ordinances 67, 72, 83, 105, and 145, which, according to the Mayor, granted UPRC the right of way. Doc. 86 at 242.[9]

## G. This Lawsuit

In January 2019, the City filed this lawsuit against UPRC. Doc. 1. In April 2019, the parties jointly moved to stay several deadlines because they were attempting to resolve the matter. Doc. 10. The Court granted the request. Doc. 11.[10] Thereafter, in July 2019, November 2019, February 2020, and April 2020, the parties requested the Court continue to stay the matter to allow them additional time to resolve the issues. Docs. 13, 15, 18, 20. The Court granted the parties' requests, ultimately staying the matter until September 1, 2020. Docs. 14, 16, 19, 21.

On August 28, 2020, the parties reported they finalized agreements for the repair of two crossings and were "working out agreements" as to the repairs of certain at-grade crossings. Doc. 22 at 1. Although settlement discussions were ongoing, the parties asked the Court to set certain deadlines. *Id*. at 2. On September 2, 2020, the Court granted the parties' request. Doc. 23.

On November 18, 2020, the City filed its Second Amended Complaint. Doc. 32. In Count One, entitled "Breach of Contract and Specific Performance," the City contends UPRC has "failed to 'keep in repair' and maintain the Crossings 'in good condition'"; "[d]espite demand, [UPRC] has refused to take action to make the necessary repairs to the Crossings and otherwise maintain them 'in good condition'"; and the "City has been damaged by and suffered harm as a result of [UPRC]'s material breaches of the Ordinances." *Id*. at 8-10. The City claims it "will suffer irreparable injury if [UPRC] is not directed to repair the Crossings and otherwise maintain them

---

[9] The parties continued to communicate about the bridges after 2013. *See* Doc. 89-1 at 3-5; Doc. 89-7 at 3-5; Doc. 102 at 8. As discussed *infra*, section III(C)(3), the Court finds the City's claims are barred by the five-year statute of limitations. Thus, it is unnecessary to address later communications.

[10] Initially, the Honorable John T. Maughmer presided over this matter. On September 28, 2020, it was transferred to the undersigned. Doc. 24. In November 2020, the parties consented to the undersigned's jurisdiction. Docs. 29-30.

'in good condition.'" *Id*. at 10. In Count Two, the City seeks a declaratory judgment "determining the legal rights and obligations of the parties with regard to the Crossings." *Id*. at 10-11.

## H.    Pending Motions

On November 30, 2021, both parties filed summary judgment motions. Docs. 86, 88. In its motion, the City asks the Court to enter summary judgment in its favor on both claims and determine (1) UPRC has an unqualified obligation under the Ordinances to "keep in repair" and maintain the Crossings "in good condition for the safe and convenient passage of persons, animals, teams and vehicles," (2) UPRC, at its sole cost and expense, must promptly repair, reconstruct, and maintain the Crossings, and (3) UPRC must periodically inspect the Crossings no less frequently than required by MoDOT and industry standards and take necessary and appropriate actions to maintain the crossings in a safe condition for use by the traveling public for as long as UPRC is operating the railroad. Doc. 88 at 1-2; Doc. 89 at 27.[11] The City also maintains UPRC has a "common law duty" to maintain, repair, and replace the bridges. Doc. 89 at 26-27.

UPRC seeks summary judgment in its favor on all claims. Docs. 86-87. It argues the City's claims are preempted by federal law. Doc. 87 at 24-33. If the claims are not preempted, UPRC contends the City's ordinances do not create an enforceable contract because they (1) are no longer in force or valid, (2) were not signed by UPRC or its predecessor, and (3) placed no duty on UPRC relative to the bridges. *Id*. at 6-7, 18-24. UPRC also asserts the City's breach of contract

---

[11] The City expressly stated it was not seeking summary judgment on its request to fine UPRC for "failure to 'keep in repair' and maintain the Crossings 'in good condition for the safe and convenient passage of persons, animals, teams and vehicles'" because it believed these matters involve "material issues of fact that will need to be resolved at trial." Doc. 89 at 1 n.1.

claim is barred by, *inter alia*, the applicable statute of limitations.  *Id*. at 6-7, 14-18, 24-33.[12]  UPRC

also filed a motion to exclude certain testimony of the City's expert.  Doc. 79.

Roughly ten weeks after the parties' summary judgment motions became fully briefed, the

City filed two motions.  Docs. 111-12.  Both motions seek leave to file supplemental authority for

the Court to consider when deciding the summary judgment motions.  *Id*.  The Court first addresses

the latest filed motions before turning to the other pending motions.

## II.  MOTIONS FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITIES

On May 4, 2022, the City filed a Motion for Leave to File Notice of Supplemental

Authorities.  Doc. 111.  The sole basis of the City's motion is to "bring to the Court's attention

three pertinent cases addressing a key issue discussed at the parties' mediation."  *Id*. at 1.  After

providing case citations, the City repeats it is providing the authorities because of "a key legal

issue raised by Defendant . . . at the recent mediation."  *Id*.  By including information shared during

mediation, the City and its counsel violated the Court's General Order for the Mediation and

Assessment Program.  W. Dist. of Mo., General Order for Mediation & Assessment Program (Nov.

14, 2019), available at https://www.mow.uscourts.gov/sites/mow/files/MAP_GO.pdf.

The General Order directs parties and their counsel to "treat as confidential the contents of

any written mediation statement and anything said in mediation, including any position taken and

any views of the case as expressed by any participant or Mediator."  *Id.*  at 11.  Relevant here, the

General Order prohibits parties and their counsel from divulging confidential information to the

---

[12] In response to the City's summary judgment motion, UPRC filed its opposition brief in which it responded to the City's Statement of Uncontroverted Facts.  Doc. 102.  It also filed a separate document: Objections to Plaintiff's Summary Judgment Proof.  Doc. 101.  Therein, UPRC objected to the admissibility of certain evidence the City proffered.  *See id*. at 1-7.  The Court's Local Rules do not expressly prohibit such a filing, but they do not invite or otherwise indicate such a filing is permitted.  *See generally* L.R. 56.1.  Instead of two filings, UPRC should have included its admissibility objections in its responses to the City's Statement of Uncontroverted Facts.  Regardless, the Court considered UPRC's objections to evidence related to the material facts in this matter.  *See supra*, sections I(A), I(D), I(F); *see infra*, section III(C)(1).  UPRC's objections to the expert report and an email from Jeff Devashrayee are not addressed because the Court does not rely on either document in reaching its decisions on the pending motions.

assigned judge. *Id*. If a party or counsel fails to comply "with the provisions and spirit" of the General Order, the assigned judge may impose sanctions. *Id*. at 12.

On May 5, 2022, the City filed a Notice of Withdrawal of its May 4, 2022 Motion and Substituted Motion for Leave to File First Notice of Supplemental Authorities ("Substituted Motion"). Doc. 112. In the Substituted Motion, the City states it is bringing "to the Court's attention three pertinent cases addressing an issue raised in Defendant's Reply." *Id*. at 1. The City briefly summarizes the three cases, which were cited in its prior filing. Doc. 112-1.

While the Court appreciates the City's efforts to remedy the error of including confidential information in its May 4, 2022 motion, the withdrawal of a motion does not and will not cure the violation of the General Order. The confidential information has been communicated to the assigned judge, and it remains a part of the record in this matter. The Court, however, can cure one of those issues by striking the initial motion. Accordingly, the Clerk of the Court is directed to **STRIKE** the City's May 4, 2022 motion (Doc. 111). At this time, the Court declines to impose additional sanctions against the City or its counsel for violating the General Order.

Turning to the relief sought in the Substituted Motion, the City briefly summarizes three cases. Docs. 112, 112-1. One case was discussed in the City's opposition to UPRC's summary judgment motion. *See* Doc. 103 at 22-24. Thus, the City already notified the Court of that case. The City explains the other two cases address an issue raised in UPRC's reply. Doc. 112 at 1-2. But it was the City that raised the continuing wrong doctrine in its opposition to UPRC's summary judgment motion. Doc. 103 at 23-24. UPRC's reply did not raise a new issue; it responded to the City's argument. Doc. 108 at 10. Further, the cases cited by the City were decided before it filed its opposition brief, and the City fails to explain why it could not include the cases. *See* Doc. 112. Accordingly, the City's Substituted Motion is **DENIED.**

### III.  MOTIONS FOR SUMMARY JUDGMENT

**A.  Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (citations omitted).  To support its assertion that no genuine dispute of material fact exists, the movant must cite "to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also* Fed. R. Civ. P. 56(c)(3)-(4), (e); L.R. 56.1(a), (d).  In response, the nonmovant must set forth facts, supported by evidence, demonstrating a genuine issue for trial; showing the movant's cited materials "do not establish the absence . . . of a genuine dispute" or the movant "cannot produce admissible evidence to support the fact"; and/or objecting "that the material cited . . . cannot be presented in a form . . . admissible in evidence." Fed. R. Civ. P. 56(c)(1)-(2); *see also* Fed. R. Civ. P. 56(c)(3)-(4), (e); L.R. 56.1(b), (d).

When considering a summary judgment motion, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmovant. *See Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003).  The Court, however, is not permitted to make credibility determinations or weigh evidence. *Id*.  If the record "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)); *see also Lissick v. Andersen Corp.*, 996 F.3d 876, 882 (8th Cir. 2021) (citation omitted).

**B.      Preemption**[13]

UPRC argues it is entitled to summary judgment because the City's claims are preempted by federal laws.  *See* Doc. 87 at 24-33.  The Supremacy Clause "provides Congress with the power to pre-empt state law."  *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 368 (1986); U.S. Const., art. VI, cl. 2.  "Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field."  *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012); *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617-18 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)) (stating when federal and state laws "directly conflict," making it "impossible for a private party to comply with both state and federal requirements," "state law must give way.").

If a statute includes an express preemption clause, the Court "must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).  Congress's intent may also be discerned from "the statutory framework surrounding" the preemption statute, and the "structure and purposes of the statute as a whole."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (internal citations and quotation marks omitted).  Whether preemption applies is a legal question for the Court to determine.  *See Nat'l Bank of Com. of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).  A party claiming preemption has the burden of establishing preemption.  *See Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009); *BNSF Ry. Co. v. Swanson*, 533 F.3d 618, 621 (8th Cir. 2008).

---

[13] Ordinary or defensive preemption, not complete preemption, is at issue.  *See Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012) (explaining complete preemption applies "where a federal statute so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal," and "[o]rdinary preemption is a federal defense that exists where a federal law has superseded a state law claim.") (internal citations and quotation marks omitted).

### (1)    ICCTA

UPRC maintains the City's claims are preempted by the Interstate Commerce Commission Termination Act ("ICCTA").  Doc. 87 at 24-34.  Enacted in 1995, "ICCTA repealed much of the economic regulation previously conducted by the I[interstate] C[commerce] C[omission] and by state railroad regulators working in conjunction with the ICC." *City of Ozark v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1170 (8th Cir. 2016) (citation omitted).  "To further the goal of limited state regulation of interstate rail transportation, Congress included a broadly worded preemption provision" in ICCTA. *Id*.  Pursuant to ICCTA, the Surface Transportation Board ("STB")[14] has exclusive jurisdiction over the following:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State[.]

49 U.S.C. § 10501(b).  "[W]ith respect to regulation of rail transportation," the remedies set forth above "are exclusive and preempt the remedies provided under Federal or State law." *Id*.

According to the STB, ICCTA preempts three types of state statutes, regulations, and judicial remedies. *City of Ozark*, 843 F.3d at 1171 (citing *CSX Transp., Inc.*, STB Fin. Dkt. No. 34662, 2005 WL 1024490, at *2-3 (May 3, 2005)).[15]  First, ICCTA preempts "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations." *CSX Transp., Inc.*, 2005 WL 1024490, at *2 (citations omitted).  Second, ICCTA preempts state and local regulations pertaining to "matters directly

---

[14] "Board," as referenced in 49 U.S.C. § 10501(a)(1), is the Surface Transportation Board.  49 U.S.C. § 10102(1).

[15] The Eighth Circuit has approved the STB's determination of ICCTA's reach as "a reasonable, permissible interpretation" of section 10501(b). *City of Ozark*, 843 F.3d at 1173 (citing *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144-45 (8th Cir. 2015) (collecting cases)).

regulated by" the STB, such as but not limited to "the construction, operation, and abandonment of rail lines." *Id.* (citations omitted). Third, ICCTA preempts "state or local actions that…would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* at *3. While the first two types of statutes, regulations, and judicial remedies are "facially" or "categorically preempted" by ICCTA, the third type "requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* (citation omitted).

UPRC argues the City's claims are preempted by ICCTA because the City seeks to interfere, manage, and/or govern how the railroad constructs and maintains its operations. Doc. 87 at 7, 24-33. The City contends UPRC has not established the Missouri laws upon which it brings its claims are preempted by ICCTA. Doc. 103 at 36-42. In their briefing, both parties cite *Iowa, Chicago & Eastern Railroad Corp. v. Washington County*, 384 F.3d 557 (8th Cir. 2004) (hereinafter, "IC&E Railroad"). Doc. 87 at 29-30; Doc. 103 at 36-41.

In *IC&E Railroad*, the underlying dispute arose from an Iowa county seeking replacement of four bridges, which the railroad was unwilling to finance. *Id.* at 558.[16] The question before the Eighth Circuit was whether an Iowa statute requiring "[e]very railroad company" to "build, maintain, and keep in good repair all bridges, abutments, or other construction necessary to enable it to cross over or under any . . . public highway, or other way," was preempted by ICCTA. *Id.* After reviewing "a complex array of statutes and regulations," the Eighth Circuit concluded "Congress for many decades has forged a federal-state regulatory partnership to deal with problems of rail and highway safety and highway improvement in general, and the repair and

---

[16] In *IC&E Railroad*, two bridges carried the rail line over a county highway, one bridge was destroyed by a fire and had not been replaced, and the fourth bridge had "a sharp crest, creating the risk that trucks, farm equipment, school busses, and emergency vehicles 'will bottom out' on the crossing." 384 F.3d at 558.

replacement of deteriorated or obsolete railway-highway bridges in particular." *Id*. at 561. According to the Eighth Circuit, "ICCTA did not address these problems." *Id*. And ICCTA's "silence cannot reflect the requisite 'clear and manifest purpose of Congress' to preempt traditional state regulation of public roads and bridges that Congress has encouraged in numerous other statutes." *Id*. (quoting *Easterwood*, 507 U.S. at 664). Thus, the Eighth Circuit concluded ICCTA did not preempt the Iowa statute. *Id*. at 561-62.

In addition, the Eighth Circuit has considered whether ICCTA may preempt a city's request for an order requiring UPRC to restore a public at-grade rail crossing, which was closed in violation of state law, or a city's request for an order allowing the city to condemn UPRC's land across the public crossing. *City of Ozark*, 843 F.3d at 1169. Specific to railroad crossings, the Eighth Circuit acknowledged, when a court "determines that the railroad has made no showing that a remedy allowing use of a particular crossing would unreasonably interfere with rail transportation, then the court may proceed to resolve the crossing dispute applying relevant state law contract, property, or condemnation principles." *Id*. at 1171 (citation omitted). But a claim is "preempted if the requested remedy will . . . impede rail operations or pose undue safety risks." *Id*. at 1172 (internal quotation marks omitted). Further, the Eighth Circuit stated that whether interference with rail operations "arises from a public or private easement, or from opening a new crossing or restoring an abandoned crossing, is <u>irrelevant</u> to the federal preemption analysis." *Id*. (emphasis added).

The Eighth Circuit concluded an order requiring UPRC to restore a crossing that was closed in violation of state law would be preempted by ICCTA "<u>if</u> that restoration will unreasonably interfere with rail operations as they are conducted today or are likely to be conducted in the future." *Id*. (emphasis added). Because the district court did not determine whether the dispute

was within the STB's exclusive jurisdiction, the Eighth Circuit remanded the matter.  *Id*.  The Court, however, noted UPRC "presented concrete evidence that reopening" the crossing "would impede rail operations or pose undue safety risks."  *Id*. at 1173 (citation and internal quotation marks omitted).  And, thus, it "appear[ed] that an order reopening the Crossing is within the STB's exclusive jurisdiction."  *Id*.

In the matter before this Court, the City alleges a breach of contract claim and seeks an order directing UPRC to repair or replace four bridges that carry pedestrian and vehicular traffic over railroad tracks.  *See* Doc. 32.  Although UPRC acknowledges ICCTA preempts claims when the requested relief would unreasonably interfere with the railroad's operations (*see* Doc. 87 at 27-28, 31-33 and Doc. 108 at 17), UPRC does not satisfy its burden of demonstrating preemption. *See Elam v. Kan. City. S. Ry. Co.*, 635 F.3d 796, 813 (8th Cir. 2011) (stating the court must ascertain whether the railroad has "come forward with evidence of the specific burdens imposed," and holding "[g]eneral evidence that rail crossings affect rail transportation is insufficient.").

Specifically, UPRC does not present any evidence or otherwise establish the repair or replacement of the bridges would unreasonably interfere with railroad operations.  Instead, UPRC contends the City's "demands interfere with the uniform operations of the railroad," "[t]he ordinances . . . interfere with the railroad operations by requiring [UPRC] . . . to maintain railroad facilities as dictated by someone other than federal regulators," "interference is patent in this case," and replacement of bridges over the railroad tracks "would necessarily involve entering railroad tracks with equipment and would require the replacement of railroad property."  Doc. 87 at 7, 31; Doc. 108 at 17.  But UPRC cites nothing in the record to support these contentions.  *See id.* Generalities and suggestions that the repair or replacement of the bridges would affect the railroad's operations are insufficient.  *See Elam*, 635 F.3d at 813.

Based on the record, the Court finds the relief sought by the City, if granted, would not "directly attempt to manage or govern a railroad's decisions in the economic realm." *Id.* at 807. Thus, on the record before the Court, the City's claims are not preempted by ICCTA. The Court **DENIES** UPRC's motion for summary judgment on the issue of ICCTA preemption.

### (2)    FRSA

UPRC also contends the City's claims are preempted by the Federal Railway Safety Act ("FRSA"). Doc. 87 at 30 n.47. In 1970, Congress passed FRSA to "promote safety in every area of railroad operations." *BNSF Ry. Co.*, 533 F.3d at 621 (quoting 49 U.S.C. § 20101). FRSA's preemption clause declares, in relevant part, states "may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation (with respect to railroad safety matters) . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106. The Supreme Court has explained regulations "cover" railroad safety concerns if they "comprise, include, or embrace [that concern] in an effective scope of treatment or operation." *Easterwood*, 507 U.S. at 664-65 (internal citation omitted). As observed by the Eighth Circuit, the FRSA preemption provision is "employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses." *Chapman v. Lab One*, 390 F.3d 620, 626-27 (8th Cir. 2004) (citation omitted).

While UPRC argues the City's claims are preempted by FRSA, it does not establish the state law allowing a breach of contract claim or the ordinances upon which the City bases its breach of contract claim are preempted by FRSA. In fact, UPRC's summary judgment motion does not explain how the City's claim or the ordinances relate to railroad safety. *See* Doc. 87. Thus, UPRC fails to satisfy its burden of demonstrating the City's claims are preempted by the FRSA.

Accordingly, the Court **DENIES** UPRC's summary judgment motion on the issue of FRSA preemption.

## C.     The City's Breach of Contract Claim

The City alleges UPRC breached a contract, and it demands specific performance of the contract. Doc. 32 at 8-10. Both parties seek summary judgment on the City's breach of contract claim. When, as is relevant here, federal jurisdiction is based on diversity of citizenship, this Court applies state substantive law. *See Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589-90 (8th Cir. 2022). The parties rely on Missouri state law when analyzing the City's breach of contract claim. *See* Doc. 87 at 15-24; Doc. 89 at 15-26. The Court does the same.

### (1)     Validity of the Ordinances

The City's breach of contract claim is premised on Ordinances 67, 72, 75, 79, and 105 ("the ordinances") creating binding obligations on MPRC and its predecessor, UPRC. *See* Doc. 89 at 15-26; Doc. 103 at 26-30. Before determining if the ordinances created an enforceable contract, the Court must first determine whether the ordinances are valid.

"Municipal ordinances are presumed valid, and will be construed in light of the presumption of validity." *Tupper v. City of St. Louis*, 468 S.W.3d 360, 371 (Mo. banc 2015) (internal and other citations omitted). Although presumptively valid, whether an ordinance is valid is a question of law. *City of Sullivan v. Sites*, 329 S.W.3d 691, 693 (Mo. banc 2010); *Kan. City v. Lucas*, 139 S.W. 348, 351 (Mo. 1911).[17] As the party challenging the presumptive validity of the City's ordinances, UPRC bears the burden of showing the ordinances are invalid. *See Wermager*

---

[17] Neither party discusses or provides legal authority as to whether an ordinance's validity is a question of law or fact. *See* Docs. 87, 89, 102-03, 108-09. The City argues the ordinances are valid, citing the City Clerk's declaration that the ordinances have not been amended, modified, or repealed. Doc. 89 at 15; Doc. 89-1 at 5; Doc. 103 at 27. But the City does not cite authority establishing the City Clerk's declaration is sufficient to show the ordinances remain valid, particularly when the City adopted a municipal code in 1988 that expressly repealed "[a]ll ordinances of a general and permanent nature." Doc. 87 at 11; Doc. 103 at 11. Because an ordinance's validity is a question of law, the Court does not rely on the City Clerk's representation that the ordinances have not been repealed.

*v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) (citation omitted); *City of Aurora v. Spectra Comm'cns Grp.*, LLC, 592 S.W.3d 764, 786 (Mo. banc 2019). While UPRC "does not deny the original validity of the ordinances," it argues the ordinances were repealed, and therefore, are now invalid. *See* Doc. 87 at 18-20; Doc. 102 at 11.[18]

When adopting its municipal code, the City proclaimed, "ordinances of a general and permanent nature enacted on or before April 12, 1988 and not included in the Code or recognized and continued in force by reference therein are hereby repealed."[19] *Id.* at 11; Doc. 103 at 11; Carthage, Mo., Mun. Code Preface & Adopting Ordinance (2011), https://library.municode.com/ mo/carthage/codes/code_of_ordinances/168920?nodeId=COCA. The parties do not argue (and the Court is unable to locate) a provision in the City's municipal code referencing Ordinances 72, 75, 79, 105, and/or 67. Instead, UPRC argues the City's Code does not include or recognize the relevant ordinances, and therefore, the ordinances have been repealed. Doc. 87 at 18. The City maintains the relevant ordinances are of a specific (not general) nature, and thus, were not repealed when it adopted its Code. Doc. 103 at 11, 28. In its reply, UPRC contends that, at a minimum, Ordinances 67 and 105 were repealed because those ordinances are general. Doc. 108 at 11-12.

A general ordinance is "general in nature and [has] an obligatory force on the community and on the administration of the municipal government." 5 McQuillin Mun. Corp. § 15.10 (3d ed. Supp. 2021). Special ordinances "grant franchises and special privileges to persons or corporations; establish improvement districts . . .; [and] provide for public work and improvement, such as sewers and streets and sidewalks." *Id.*; *see City of Aurora*, 592 S.W.3d at 782 (finding a

---

[18] Because UPRC concedes the ordinances were valid initially, the Court does not address the lack of evidence establishing Ordinances 79 and 105 were published as required by the City's charter. *See supra*, section I(A). In addition, the Court does not discuss the constitutionality of the ordinances because UPRC does not raise that argument.

[19] The parties acknowledge ordinances may be repealed expressly or "where total repugnancy exists between a later and an older ordinance or law." *City of St. Louis v. Kellman*, 139 S.W. 443, 444 (Mo. 1911); Doc. 87 at 19; Doc. 103 at 27-30. Defendant solely focuses on the ordinances being expressly repealed; the Court does the same.

new policy that did not disrupt "the reasonable reliance of those that acted lawfully before the change in policy" was not a special law); *Mo. Pac. R.R. Co. v. Public Serv. Comm'n of Mo.*, 297 S.W. 47, 50 (Mo. 1927) (holding an act relating "to all grade crossings of railroads by state highways" was not special legislation); *Riggins v. City of Kan. City*, 351 S.W.3d 742, 754 (Mo. Ct. App. 2011) (citation omitted); *see also* Doc. 103 at 28; Doc. 108 at 11.

Ordinances 72 and 79 grant MPRC, UPRC's predecessor, the right of way to construct, maintain, use, and operate a railroad (as well as "turnouts, switches, side tracks," and "suitable crossings") along, on, and/or through particular streets and intersections in the City, "keep all such crossings and approaches in good condition" and make and "put in a good safe condition for travel" "the bridge, and necessary grade of the street to approach the same, on Walnut Street . . . ." Doc. 89-1 at 28-32, 36-40, 42-44. Ordinance 75 grants MPRC the right of way to construct a railroad "in, along, and through Parsons Street" before August 1, 1881, and requires MPRC to "construct and keep in repair suitable crossings" on certain streets and "keep all such such crossings and approaches in good condition for the safe and convenient passage of animals, teams and persons." Doc. 89-1 at 36-40. These three ordinances grant special privileges to MPRC and provide for public work and improvement. Accordingly, Ordinances 72, 75, and 29 are special ordinances, and thus, were not repealed when the City adopted its Code in 1988.

Ordinances 67 and 105, however, are not specific to MPRC. These ordinances require all railroad companies owning and operating railroads in and through the City to construct, maintain, and keep in repair bridges, tunnels, and crossings, and upon notice from the City, construct or repair bridges, tunnels, and crossings. Doc. 89-1 at 46-49, 51-59. If a railroad company fails to construct or repair a bridge, tunnel, or crossing, the City could recover the repair costs (Ordinance No. 105), and the railroad company could be fined and deemed guilty of a misdemeanor

(Ordinance No. 67). *Id.* Because these ordinances place obligations on all railroads, Ordinances 67 and 105 are general ordinances, which were repealed with the City's Code in 1988.[20]

### (2) Whether Ordinances 72, 75, and 79 are Contracts

To establish a prima facie case of breach of contract, the City must establish (1) the existence and terms of a contract,[21] (2) the plaintiff performed pursuant to the contract, (3) the defendant breached the contract, and (4) the plaintiff suffered damages. *See Watterson v. Wilson*, 628 S.W.3d 822, 830 (Mo. Ct. App. 2021) (citation omitted). In certain instances, courts have found ordinances and statutes granting rights and franchises become contracts once they are passed, and the grantee accepts the rights and franchises. *See, e.g.*, *St. Cloud Pub. Serv. Co. v. City of St. Cloud*, 265 U.S. 352, 362-63 (1924); *Columbus Ry., Power & Light Co. v. City of Columbus*, 249 U.S. 399, 409-10 (1919); *Kan. City Ins. Agents' Ass'n v. Kan. City*, 4 S.W.2d 427, 430-31 (Mo. banc 1928); *Springfield Ry. Co. v. City of Springfield*, 85 Mo. 674, 676 (1885).

The City argues its ordinances are contracts because they grant the right of way to MPRC to build and construct its railroad, MPRC accepted and acted upon the rights extended by the City by building and operating the railroad, and MPRC continuously operated the railroad until it was acquired by UPRC. Doc. 89 at 16-19. UPRC does not dispute that ordinances may be construed as contracts, but it argues the City is not entitled to summary judgment because (a) there is no evidence of acceptance, (b) there was no bargained for consideration, and (c) the ordinances do not have a termination date or termination clause. *See* Doc. 87 at 24; Doc. 102 at 11-26.

---

[20] Even if the Court were to conclude Ordinances 67 and 105 were not general ordinances, its decisions on the pending motions would remain unchanged because the same reasons support entry of summary judgment in UPRC's favor with regard to these ordinances.

[21] The essential elements of a contract are (1) offer, (2) acceptance, and (3) bargained for consideration. *See Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. banc 2014).

### (a)    Acceptance

UPRC claims there is no evidence that its predecessor, MPRC, accepted the ordinances and built the bridges.  Doc. 87 at 20-21; Doc. 102 at 13-14.  The Court agrees the City did not present admissible evidence establishing MPRC built the bridges.  *See supra*, section I(D).[22]  Yet, the record establishes MPRC entered into a lease agreement with MNAR in 1992 in which MPRC represented it had full authority to lease certain railroad lines in and around the City.  Doc. 89-3 at 5, 22, 52-57.  Therein, MPRC leased MNAR, *inter alia*, the right-of-way, tracks, crossings, and bridges, and MNAR agreed to maintain grade crossings and bridges.  *Id*. at 5, 18, 22.

UPRC concedes it acquired MPRC and its holdings in 1997.  Doc. 102 at 6.  As MPRC's successor, UPRC entered into amended agreements with MNAR permitting MNAR to continue leasing railroad lines in and around the City.  Doc. 89-3 at 67-73.  While it is unknown if MPRC built the bridges in question, the record establishes MPRC, at some time before 1992, acted upon the ordinances that granted it the right-of-way by leasing the right-of-way, tracks, crossings, and bridges to MNAR.  *See Springfield Ry. Co.*, 85 Mo. at 676 (observing when an ordinance granting a railroad "the right to construct, maintain, and operate a street railroad on certain designated streets" is "accepted, and certainly when acted upon, takes on many of the elements of a contract.").  Based on the evidence in the record, the Court finds the City established the ordinance was accepted by the actions taken by MPRC, which was later succeeded by UPRC.

### (b)    Consideration

UPRC contends there is no bargained for consideration because UPRC "was not a voluntary participant in any contractual process," and thus, no obligations can be imposed on it.

---

[22] Additionally, the Missouri Supreme Court case cited by the City does not establish MPRC built the bridges at issue in this matter.  Doc. 109 at 4-5 (citing *Davis v. Mo. Pac. Ry. Co.*, 24 S.W. 777 (Mo. 1893)).  While *Davis* indicates MPRC built the McGregor Street bridge, there is no mention of the bridges at issue in this matter.

Doc. 102 at 16.[23]  The City counters that MPRC sought to operate and construct railroad tracks in and through the City, and MPRC was granted the right of way and a continuing right of occupancy at no cost.  Doc. 109 at 4-7.  MPRC, in turn, agreed to maintain the railroad lines and crossings. *Id*.  The City contends UPRC, as the successor in interest, is bound by the ordinances.  *Id*. at 6.

Consideration is "a benefit to the party promising, or a loss or detriment to the party to whom the promise is made."  *MFA Inc. v. Dettler*, 817 S.W.2d 658, 663-64 (Mo. Ct. App. 1991) (citation omitted) (holding it was not error to instruct the jury that consideration "means a benefit to the defendant, or a loss or detriment to the plaintiff.").  There is no dispute that MPRC received a benefit when it was granted the right of way at no cost.  Accordingly, there was bargained for consideration.

UPRC's focus on its lack of involvement in the contractual process is misplaced.  UPRC, as MPRC's successor in interest, assumes liability for the conditions attached to MPRC receiving the right of way.  *See City of Independence v. Mo. Pac. Ry. Co.*, 86 Mo. App. 585, 588 (1901); *see also supra*, section III(C)(2)(a).  UPRC's lack of involvement in the initial contract does not pertain to whether there was adequate consideration.

### (c)  Lack of Termination Date and Termination Clause

Finally, UPRC asserts the City did not establish a prima facie claim for breach of contract because "there is no termination date in the 'contract'" and "no mechanism for termination by anyone."  Doc. 102 at 16.  UPRC, however, cites no authority for its argument.  *See id*.; *see also* Docs. 87, 108.  A party waives an argument or issue if it sets forth a bare assertion that is not meaningfully developed or argued.  *See United States v. Reed*, 972 F.3d 946, 955 n.5 (8th Cir. 2020) (finding the merits of a claim could not be considered because the party provided "no basis

---

[23] In support, UPRC cites two cases.  *See* Doc. 102 at 16.  Neither presents facts relevant to those before the Court.

in law or fact for his cursory assertions of error"); *Milligan v. City of Red Oak*, 230 F.3d 355, 360 (8th Cir. 2000) (declining to address an issue because the party failed to "support his assertion with any argument or legal authority," and thus, "waived the issue"); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). By making a bare assertion without legal authority and failing to meaningfully develop the argument, UPRC waived its argument that the contract fails for lack of a termination date or termination clause.

### (3)    Statute of Limitations

While the ordinances may be considered contracts, UPRC argues it is entitled to summary judgment on the City's breach of contract claim because it is barred by the statute of limitations. *See* Doc. 87 at 15-18, 20-24. In Missouri, two statutes of limitations relate to contract actions – section 516.110 and section 516.100. *See DiGregorio Food Prods., Inc. v. Racanelli*, 609 S.W.3d 478, 480 (Mo. banc 2020) (citation omitted). Pursuant to section 516.110(1), "[a]n action upon any writing, whether sealed or unsealed, for the payment of money or property" shall be brought within ten years. Mo. Rev. Stat. § 516.110(1). Section 516.120(1) states, "[a]ll actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110, . . . and except where a different time is herein limited" shall be brought within five years. Mo. Rev. Stat. § 516.120(1). The Missouri Supreme Court explained the interplay between the statutes:

> Section 516.110(1) is an exception to the general five-year limitations period established by section 516.120(1). The exception mentioned in section 516.110(1) consists of "actions upon a written contract . . . for the payment of money or property." The plain language of section 516.120(1), however, applies generally to all breach of contract actions, including written contracts containing a promise for the payment of money or property.

27

*Rolwing v. Nestle Holdings, Inc.*, 437 S.W.3d 180, 182 (Mo. banc 2014), *as modified* (Aug. 19, 2014) (citation and internal footnote omitted). UPRC contends section 516.120(1)'s five-year statute of limitations applies because the ordinances do not contain express written obligations for the payment of money. Doc. 87 at 15-17; Doc. 108 at 7-9. The City, on the other hand, argues section 516.110(1)'s ten-year statute of limitations applies because it brings an equitable action for enforcement of a contract. Doc. 103 at 22-23.[24]

<blockquote>(a)     **Determination of Applicable Statute of Limitations**</blockquote>

For section 516.110(1)'s ten-year statute of limitations to apply, there must be "a written promise to pay money." *DiGregorio Food Prods.*, 609 S.W.3d at 480. "The essence of a promise to pay money is that it is an acknowledgment of an indebtedness, an admission of a debt due and unpaid." *Id.* at 481 (quoting *Martin v. Potashnick*, 217 S.W.2d 379, 381 (Mo. 1949)). Importantly, "the promise to pay money must arise from the writing's explicit language; extrinsic evidence cannot supply the promise." *Id*. (citing *Cmty. Title Co. v. Stewart Title Guar. Co.*, 977 S.W.2d 501, 502 (Mo. banc 1998)). If the contract a party seeks to enforce does not satisfy the "written promise to pay" requirements, section 516.110(1)'s five-year statute of limitations applies. *Id*. at 480 (citations omitted); *see also Rolwing*, 437 S.W.3d at 183 (finding the trial court did not err in concluding the five-year statute of limitations applied to a breach of contract claim for damages that were "not based on a promise in the contract").

Perhaps most relevant to this matter, the Missouri Court of Appeals has considered whether an ordinance constitutes a promise to pay within the meaning of section 516.110(1). In *Barberi v. University City*, the appellate court found employees' claims based on a civil service rule adopted

---

[24] In the Second Amended Complaint, the City alleges the bridge repairs "will cost over $3,500,000." Doc. 32 at 10. However, in response to UPRC's summary judgment motion, the City clarifies it seeks to enforce a contract but does "*not* seek actual damages." Doc. 103 at 22.

pursuant to an ordinance were barred by the five-year limitation period. 518 S.W.2d 457, 458 (Mo. Ct. App. 1975). Applying section 516.110(1)'s requirement that a written promise to pay money "must arise from the writing itself and may not be shown by extrinsic evidence," the Court determined the civil service rule, adopted by ordinance, was "silent as to any additional compensation," there was "no promise for the payment of extra money," and any additional obligation to pay the employees was "not expressed" in the rule. *Id*. The Court also observed the employees' compensation was "fixed by ordinances, not by civil service rule." *Id*. at 459. Thus, the Court found section 516.120(1)'s five-year statute of limitations applied. *Id*.[25]

While the City contends the ten-year statute of limitations applies, it fails to establish how the ordinances satisfy the "promise to pay" requirements. *See* Doc. 103 at 21-22.[26] Moreover, the Court notes Ordinances 72, 75, and 79 do not contain any promise by MPRC, UPRC's predecessor, to pay money to the City. *See* Doc. 89-1 at 28-32, 36-40, 42-44. Further, the ordinances do not contain an acknowledgment or admission by MPRC of any indebtedness to the City. *See id*. By examining the ordinances only, as the Court must do, it finds the ordinances do not satisfy the requirements of a written promise to pay. Thus, section 516.120(1)'s five-year statute of limitations applies.

---

[25] In *Barberi*, the Court relied in part on *Coleman v. Kansas City*, 173 S.W.2d 572 (Mo. 1943). 518 S.W.2d at 458-59. In *Coleman*, city employees sought to recover the difference between the salaries they received and the amount they claimed they were owed under an ordinance. 173 S.W.2d 572, 573 (Mo. 1943). The Missouri Supreme Court held the five-year statute of limitations applied to the employees' claims. *Id*. at 577-78. The Court, observes, however, *Coleman* did not address whether the ordinance was a written promise to pay. *See id*.

[26] The two cases cited by the City (*see* Doc. 103 at 22) actually support UPRC's position that the ten-year statute of limitations only applies to written agreements containing a promise to pay without consideration of extrinsic evidence. *See Lackawanna Chapter of Ry. & Locomotive Hist. Soc'y, Inc. v. St. Louis City*, 606 F.3d 886, 890 (8th Cir. 2010) (holding section 516.110 did not apply because there was "no formal or written instrument" for which the party sought specific performance); *Armistead v. A.L.W. Grp.*, 60 S.W.3d 25, 26-27 (Mo. Ct. App. 2001) (finding the ten-year statute of limitations applied because the agreement was a "written contract" containing "a promise . . . to pay money").

### (b)    Accrual of the City's Breach of Contract Claim

Having determined the applicable statute of limitations, the Court must address when the City's breach of contract claim accrued. UPRC argues the City's breach of contract claim accrued no later than 2013 when the City sent a letter to UPRC demanding it replace or repair the bridges. Doc. 87 at 9, 16-17; Doc. 108 at 9-10. The City avers its breach of contract claim is timely because UPRC's failure to maintain the bridges is a continuing wrong, and the record does not establish the statute of limitations accrued and expired before this lawsuit was filed. Doc. 103 at 23-24.

An action brought pursuant to section 516.120 "can only be commenced . . . after the causes of action shall have accrued." Mo. Rev. Stat. § 516.100. Such a cause of action "shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained." *Id.*

In 2006, the Missouri Supreme Court, noting "Missouri opinions have not always been wholly consistent" in what is meant by "sustained and . . . capable of ascertainment," explained three things must occur for a claim to accrue under section 516.120. *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 581-82 (Mo. banc 2006). A claim does not accrue until (1) "the wrong is done or the technical breach of duty occurs," (2) "damages occur," and (3) damages are "capable of ascertainment." *Id.* at 582 (citing Mo. Rev. Stat. 516.100). "[T]he capable of ascertainment test is an objective one." *Id.* at 584.[27] "It refers to the fact of damage rather than to the exact amount of damage." *Bus. Men's Assur. Co. of Am. v. Graham*, 984 S.W.2d 501, 507

---

[27] When "relevant facts are uncontested, the statute of limitations issue can be decided by the court as a matter of law." *Powel*, 197 S.W.3d at 585. Here, the facts related to when damages were ascertainable are uncontested. *See supra,* section I(D)-(F).

(Mo. banc. 1999). The Court focuses on "when a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages." *Powel*, 197 S.W.3d at 584; *see also Mahanna v. U.S. Bank Nat'l Ass'n*, 747 F.3d 998, 1002 (8th Cir. 2014).

The City argues UPRC's failure to maintain is a continuing wrong, and "each day that [UPRC] makes use of the right of way, but fails to keep and maintain the Crossings in good repair, gives rise to a new claim." Doc. 103 at 24. The Missouri Supreme Court first recognized the continuing wrong doctrine in 1980. *Davis v. Laclede Gas Co.*, 603 S.W.2d 554 (Mo. banc 1980). It found the doctrine should be applied only in "peculiar and particular circumstances" where "the wrong may be said to continue from day to day, and to create a fresh injury from day to day, and the wrong is capable of being terminated." *Id*. at 556.

The City relies, in part, on *Davis* to supports its continuing wrong argument. Doc. 103 at 24. But this case differs from *Davis*. In *Davis*, the plaintiff pleaded his injury was "continuous," and the Court construed the petition "as attempting to plead a continuing breach of contract and a continuing tort." 603 S.W.2d at 556. In the Second Amended Complaint, the City alleges no continuing injuries or wrongs. *See* Doc. 32. Instead, it alleges a breach of contract action averring UPRC "has failed" to keep the bridges in repair and good condition and "has refused to take action to make the necessary repairs" to the bridges. *Id*. at 8-9. The City also claims it "has been damaged by and suffered harm as a result of Union Pacific's material breaches of the Ordinances." *Id*. at 10. And the necessary repairs to repair the bridges are estimated to "cost over $3,500,000." *Id*. It does not allege a continuing wrong. For this reason alone, the City's continuing wrong argument fails.

When viewing the facts in the light most favorable to the City, as the Court must do, UPRC's alleged inactions may have caused damage, but that damage is only becoming more serious over time. This does not extend the City's time to bring suit. *See D'Arcy & Assocs., Inc. v. K.P.M.G. Peat Marwick, L.L.P.*, 129 S.W.3d 25, 30 (Mo. Ct. App. 2004) (finding damages resulting "from one wrong that continues and becomes more serious over time does not extend the time within which suit may be brought.") (citation omitted). Put a different way, UPRC's breach of contract does not cause "new and distinct" damages each day, and therefore, the continuing wrong doctrine does not apply. *See Ball v. Friese Constr. Co.*, 348 S.W.3d 172, 178 (Mo. Ct. App. 2011) (holding the continuing wrong doctrine did not apply to the plaintiff's inadequate construction claim because there were no "new and distinct damages" being caused, and the manifestation of damages was not delayed). Because new and distinct damages are not being incurred each day, the continuing wrong doctrine does not apply.

In addition, the City has known since as far back as 2002, but certainly no later than February 15, 2013, that the bridges needed repair or replacement. *See supra*, I(D) (summarizing the MoDOT inspection reports)[28] and I(E) (addressing conversations and a meeting the City held with the railroads in 2011). It was on February 15, 2013, that the City's Mayor sent a letter to UPRC demanding UPRC address the bridges' conditions. Doc. 86 at 71-73, 240; Doc. 87 at 9-10;

---

[28] The City attached several MoDOT inspection reports to its Second Amended Complaint. Doc. 32-1 at 7-28. These inspection reports reveal, *inter alia*, "basically intol[e]r[a]ble" ratings in 2002 and 2003 with regard to the Oak Street Bridge's underclearance, deck geometry, and structure evaluation; "moderate speed reduction" in 2005 for the Oak and Walnut Street bridges "due to vertical alignment"; "cracking" on the "approach wall" and "cracking and splitting of timber columns" on the Oak Street bridge in 2005; a structural deficiency on the Walnut Street bridge in 2003; a "basically intol[erable] rating regarding Walnut Street bridge's deck geometry in 2005; a mention of "consider bridge replacement" in 2005 with regard to the Walnut Street bridge; a structural deficiency noted in 2003 on the Sycamore Street bridge; "severe corrosion of steel floorbeams and stringers" and "poor condition of timber stringer and nailers" on the Sycamore Street bridge in 2005 and 2008; the closing of the Sycamore Street bridge in 2013; "basically intol[e]r[a]ble" ratings in 2002 and 2003 related to the High Street bridge's structure and deck geometry; a report of the "cross bracing on east pier" on the High Street bridge being split in 2009; and seals on the asphalt deck of the High Street bridge being cracked in 2013. Doc. 32-1 at 8-28.

Doc. 89-6 at 3; Doc. 103 at 11.[29]  The Mayor declared UPRC was granted the right of way through

the City, and in exchange, the railroad was required to construct and maintain numerous crossings,

including bridges.  Doc. 86 at 240.  The Mayor informed UPRC, "the conditions of these bridges

have deteriorated significantly" and referred to a recent MoDOT inspection, which resulted in the

closure of the Sycamore Street bridge.  *Id*.  Per the letter, the City "is hereby notifying the Railroad

of these conditions and requiring the bridges be brought up to a reliable standard."  *Id*.

  As of February 15, 2013, the City believed UPRC had breached its ordinances – and thus,

breached the contracts upon which it brings suit.  The City was also aware that damage had

occurred.  When a party becomes aware of a condition or the fact of damages appears, Missouri

courts have held the continuing wrong doctrine does not apply.  *See City of N. Kan. City v. Archer

Daniels Midland Co.*, 575 S.W.3d 270, 276-77 (Mo. Ct. App. 2019) (holding a city's public

nuisance claim was capable of ascertainment when it became "aware of the dangerous

condition . . . on the property," and the city's awareness was demonstrated by its actions, including

its decision to condemn the property and sending abatement notices declaring the property a

"nuisance"); *Ball v. Friese Constr. Co.*, 348 S.W.3d 172, 177 (Mo. Ct. App. 2011) (holding the

statute of limitations began to accrue when the plaintiff became "aware of issues with the

basement"); *D'Arcy & Assocs.*, 129 S.W.3d at 29-30 (finding the plaintiff was aware it had

sustained damage in mid-1992, and the claim accrued when the damage could be ascertained).

  In addition, the Eighth Circuit has examined when the statute of limitations for a breach of

contract claim arising under Missouri law begins to accrue.  *Mahanna*, 747 F.3d at 1002-07.  In

*Mahanna*, the plaintiffs alleged a bank lost their gold coins, and in doing so, breached a contract,

---

[29] The parties do not dispute that the City and UPRC discussed repairs to the bridges before February 2013.  *See supra*, section I(E).  However, because the five-year statute of limitations applies, it is unnecessary for the Court to address events occurring before 2013 or whether the running of the statute of limitations commenced on some date prior to February 15, 2013.

acted negligently, and converted their property. *Id*. at 999-1001. The trial court granted summary judgment in the bank's favor, finding the plaintiffs' claims were barred by the statute of limitations because they knew, as early as 1997 but before 2001, that the bank was unable to locate the coins, and thus, their claims were capable of ascertainment during that time. *Id*. at 1000-01. Upon examination of Missouri courts' decisions on when the statute of limitations begins to accrue, the Eighth Circuit observed, among other things, "[t]he receipt of information sufficient to cause a reasonable person to inquire further as to the existence of a wrong or the existence or extent of damages triggers the statute of limitations." *Id*. at 1004.

Here, MoDOT informed the City of problems with the bridges beginning as early as 2002. *See supra*, section I(D). At some point between 2002 and 2012, the City had information sufficient to cause a reasonable person to inquire further about the problems with the bridges. Further, the City's February 15, 2013 letter establishes it knew about problems with the bridges, and it directed UPRC to repair the bridges. By no later than February 15, 2013, a reasonable person would have been put on notice of UPRC's wrong – that is, its breach of contract – and the existence of damages. At that point, a reasonable person would have acted to ascertain the extent of the damages.

The Court finds the City's damages were capable of ascertainment by no later than February 15, 2013. *Id*. Accordingly, the statute of limitations for the City's breach of contract claim began to run by no later than February 15, 2013. The City filed its Complaint on January 2, 2019. Doc. 1. Because the Complaint was filed more than five years after the City's breach of contract claim accrued, the claim is untimely. For this reason, the Court **GRANTS** UPRC's motion for summary judgment on the City's breach of contract claim.[30]

---

[30] Because the Court finds the City's breach of contract claim is barred by the statute of limitations, it is unnecessary for the Court to address UPRC's other defenses to the City's breach of contract claim.

**D.      Breach of Common Law Duty**

In its summary judgment motion, the City claims UPRC breached its common law duty to replace the bridges, and for this additional reason, the Court should find UPRC "has a duty and obligation to keep and maintain the" bridges.  Doc. 89 at 26-27.  In response, UPRC argues the City did not plead a breach of common law duty claim, and it cannot raise a cause of action for the first time in a summary judgment motion.  Doc. 102 at 27-28.  UPRC also contends the record does not support summary judgment on a common law duty claim, and even if it did, the claim is barred by the applicable statute of limitations.  *Id*. at 28-29.

**(1)      Standard for Stating a Claim for Relief**

To state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The pleading standard of Rule 8 of the Federal Rules of Civil Procedure does not require "detailed factual allegations" but does require "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  If a pleading contains "labels and conclusions," "a formulaic recitation of the elements" of a claim, or "naked assertion[s]" lacking "further factual enhancement," the pleading standard is not satisfied.  *Id*. (citing *Twombly*, 550 U.S. at 557).

**(2)      Second Amended Complaint**

In the Second Amended Complaint, the City refers once to "common law duty."  Doc. 32 at 7, ¶ 35.  Specifically, in the "Background Facts" of the Second Amended Complaint, the City avers, UPRC "also has a common law duty to maintain 'whatever structures may be necessary to the convenience and safety' of the Crossings."  *Id*.  This allegation is the sole basis for the City's argument that it adequately pleaded that UPRC breached its common law duty.  *See* Doc. 109 at

10. Common law duty is not referenced in Count One or Count Two, although both counts indicate they reallege and incorporate the other allegations contained in the Second Amended Complaint. Doc. 32 at 8-11. Moreover, common law duty is not implicated in the City's "Request for Relief." Instead, the City asks the Court to order UPRC to fulfill its obligations pursuant to the ordinances. Doc. 32 at 11 (claiming UPRC has "an unqualified obligation under the Ordinances to 'keep in repair' and maintain the Crossings" and must maintain and inspect the bridges "as required under the Ordinances.").

When viewing the entirety of the Second Amended Complaint, the Court finds there is no allegation that UPRC breached its common law duty. At most, the City simply stated UPRC had a common law duty. Even if the Court viewed the one statement as an allegation of breach of common law duty, the Second Amended Complaint does not satisfy the pleading standard set forth in Rule 8 and discussed in *Iqbal* and *Twombly*. It fails to include a short and plain statement of a breach of common law duty claim and does not set forth factual allegations supporting a breach of common law duty claim. Accordingly, the Court finds the City did not sufficiently plead a claim based on breach of common law duty. Therefore, the Court **DISMISSES** the City's purported claim for breach of common law duty.

### (3)    Substantive Claim

Even if the Court were to find the City sufficiently pleaded a breach of common law duty claim, the City's summary judgment motion on the claim would fail. The City contends UPRC "has a common law duty to replace the Crossings." Doc. 89 at 26. In support, the City cites two decisions by the Missouri Court of Appeals.[31] Doc. 89 at 26-27. In 1885, the Missouri Court of Appeals observed railroad companies have a "common law obligation . . . to make reasonably safe

---

[31] The City represents one case was decided by the Missouri Supreme Court. Doc. 89 at 26. But both cited cases were decided by the Missouri Court of Appeals.

crossings where they intersect a public highway." *Moberly v. Kan. City, St. Joseph & Council Bluffs Ry. Co.*, 17 Mo. App. 518, 535 (1885). Unlike this matter, the Missouri Court of Appeals addressed whether a railroad had a duty to construct embankments approaching a railway to enable travel to cross the tracks and not impair highway use. *Id.* at 537-38. The matter before this Court does not pertain to construction of embankments or a railway that crosses over a public highway.

In 1901, the Missouri Court of Appeals found a railroad occupying the right of way had a common law duty "to provide and maintain a safe crossing . . . where a new highway is made across another one already in use" and provide and maintain "whatever structures may be necessary to the convenience and safety of the crossing." *City of Independence*, 86 Mo. App. at 589 (citation omitted). Put another way, a railroad that "disturb[s] the highway must not only restore it to a condition of convenient use, but [the railroad] must *keep* it in such condition." *Id.* at 590 (citations omitted) (emphasis in original). *City of Independence*, unlike the current matter, involved a railway that intersected a public road. *Id.* at 588.

Neither case establishes the common law duty tat the City attempts to assert UPRC breached. And the City has not otherwise established it is entitled to judgment as a matter of law on a claim of breach of common law duty, if one exists. *See* Fed. R. Civ. P. 56(a).[32] For the foregoing reasons, the Court **DENIES** the City's Motion for Partial Summary Judgment.[33]

---

[32] The City also argues its common law duty claim "is supported by" a Missouri statute requiring all railroads to "construct and maintain good and sufficient crossings and crosswalks where its railroad crosses public roads, highways, streets . . . ." Mo. Rev. Stat. § 389.610(2). The City does not cite (and the Court cannot find) a definition for "crossings." Regardless, the City alleges a common law duty claim, not a claim arising from a statutory violation.

[33] Even if the Court were to find the City established a prima facie case of breach of common law duty, the Court would still deny the City's motion for summary judgment because the claim is barred by the applicable statute of limitations. The City does not counter UPRC's argument that the five-year statute of limitations applies. Doc. 102 at 29; Doc. 109 at 12. Instead, the City asserts UPRC's failure to maintain is a continuing wrong that permits the City to pursue "claims for damages related to the failure to maintain because of the continuing nature of [UPRC's] breach. Doc. 109 at 12. For the same reasons the City's breach of contract claims are barred by the statute of limitations, its common law duty claim is barred by the statute of limitations. *See supra*, section III(C)(3).

**IV.    MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY**

In addition to the parties' cross motions for summary judgment, UPRC's Motion to Exclude Certain Testimony of Plaintiff's Expert Eckhart (Doc. 79) is also pending.  Therein, UPRC moves to exclude testimony regarding Plaintiff's expert's opinions about (1) the impact of closing certain overpasses, and (2) the cost of replacing and/or repairing the bridges.  *See* Docs. 79-80.  In reaching its decisions on the summary judgment motions, the Court did not rely on Plaintiff's expert's opinions about the impact of closing overpasses or the cost of replacing or repairing the bridges.  *See supra*, section III.  Accordingly, it was unnecessary for the Court to render a decision on UPRC's motion to exclude prior to issuing its decision on the summary judgment motions.  Because the Court's decision granting summary judgment in favor of UPRC disposes of this matter, UPRC's motion to exclude is rendered moot.  Thus, the Court **DENIES AS MOOT** UPRC's Motion to Exclude Certain Testimony of Plaintiff's Expert Eckhart.

**V.    CONCLUSION**

For the foregoing reasons, the City's Motion for Leave to File Notice of Supplemental Authorities (Doc. 111) is **STRICKEN**, the City's Substituted Motion for Leave to File Notice of Supplemental Authorities (Doc. 112) is **DENIED**, UPRC's Motion for Summary Judgment is **DENIED** with regard to the issues of preemption but **GRANTED** with respect to the claims and relief sought by the City, the City's Motion for Partial Summary Judgment is **DENIED**, and UPRC's Motion to Exclude Certain Expert Testimony is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

DATE: May 13, 2022                     */s/ W. Brian Gaddy*
                                   W. BRIAN GADDY
                                   UNITED STATES MAGISTRATE JUDGE